**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2098-23
                A-2099-23

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAQUAN A. THOMAS,
a/k/a TAQUAN A. THOMAS,
and JAOUAN THOMAS,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ISMAEL LEON,
a/k/a MBA MELLOW,

      Defendant-Appellant.

_____

Submitted May 19, 2026 – Decided August 10, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 21-12-0800.

Jennifer N. Sellitti, Public Defender, attorney for appellant Jaquan A. Thomas in A-2098-23 (Molly O'Donnell Meng, Designated Counsel, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for appellant Ismael Leon in A-2099-23 (Stephen W. Kirsch, Designated Counsel, on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent State of New Jersey (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the briefs).

Appellant, Jaquan A. Thomas, filed a supplemental brief on appellant's behalf.

PER CURIAM

Following a joint jury trial, defendant Jaquan A. Thomas was convicted of murder, conspiracy to commit murder, and related weapons offenses. Defendant Ismael Leon was convicted of aggravated manslaughter, conspiracy to commit murder, and the same related weapons offenses. The charges stemmed from the fatal shooting of Jose Figueroa, a rival gang member. The State's proofs, consisting largely of testimony from three cooperating co-defendants and surveillance footage from the crime scene, showed that on May

1, 2021, five members of the 5-Deuce Hoover Crips gang (5-Deuce) shot at members of the 493 gang gathered at a memorial shrine located at an intersection in Paterson as retaliation for the 2020 shooting of Antonious Carswell, the leader of 5-Deuce. The shooters opened fire into the crowd, killing Figueroa. Thomas orchestrated the shooting and provided guns to the shooters. Leon was one of the five 5-Deuce members participating in the shooting.

In these back-to-back appeals, which we consolidate for purposes of issuing a single opinion, Thomas, in A-2098-23, raises the following points in his counseled brief for our consideration:

> POINT I
>
> THE TRIAL JUDGE IMPROPERLY ADMITTED OTHER-BAD-ACT EVIDENCE THAT DEFENDANT WAS A DRUG DEALER LOOKING TO KILL RIVAL GANG MEMBERS EVERY DAY. THE TRIAL JUDGE ALSO FAILED TO GIVE THE JURY THE NECESSARY [N.J.R.E.] 404(B) INSTRUCTION. BOTH ERRORS REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS.
>
> > i. Evidence That Defendant Was a Drug Dealer Constantly Looking To Kill Rival Gang Members Was Improperly Admitted.
> >
> > ii. The Trial Judge's Failure To Give The Jury The Necessary [N.J.R.E.] 404(b) Instruction Also Requires Reversal.

POINT II

THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL WHEN, IN SUMMATION, HE REPEATEDLY TOLD THE JURY THAT DEFENDANT ATTEMPTED TO TAMPER WITH [CO-DEFENDANT JOSEPH MORALES'S] TESTIMONY BECAUSE HE KNEW THE "TRUTH" WOULD COME OUT THAT HE WAS GUILTY (NOT RAISED BELOW).

POINT III

DETECTIVE [MICHAEL] TURNER IMPROPERLY NARRATED THE SURVEILLANCE VIDEOS AND OFFERED LAY OPINION TESTIMONY ABOUT FACTUAL MATTERS IN DISPUTE (NOT RAISED BELOW).

POINT IV

THIS COURT SHOULD ORDER A CONCURRENT TERM FOR COUNT FOUR BECAUSE THE TRIAL JUDGE ERRED BY IMPOSING CONSECUTIVE SENTENCES FOR POSSESSING THE WEAPON USED TO COMMIT THE MURDER.

Thomas raises the following additional points in a supplemental brief:

POINT I

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON CONSPIRACY TO COMMIT AGGRAVATED MANSLAUGHTER AND CONSPIRACY TO COMMIT RECKLESS MANSLAUGHTER AS LESSER-INCLUDED OFFENSES TO THE CONSPIRACY TO COMMIT MURDER CHARGE, IN VIOLATION OF HIS

4

CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST.[] AMENDS. V, VI, AND XIV; N.J. CONST.[] ART. I, ¶¶ 1, 8, 9, 10 (NOT RAISED BELOW).

POINT II

THE TRIAL COURT ERRED IN FAILING TO TAILOR ITS JURY CHARGE ON ACCOMPLICE LIABILITY TO THE FACTS OF THE CASE, INFRINGING UPON [DEFENDANT'S] RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST.[] AMENDS. V, VI, AND XIV; N.J. CONST.[] ART. I, ¶¶ 1, 8, 9, 10 (NOT RAISED BELOW).

POINT III

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON WHAT VIEW OF THE FACTS IN THE CASE THAT COULD LEAD THE JURY TO FIND [DEFENDANT] GUILTY OF THE LESSER-[]INCLUDED OFFENSES TO ACCOMPLICE LIABILITY MURDER, I.E., ACCOMPLICE LIABILITY AGGRAVATED MANSLAUGHTER AND RECKLESS MANSLAUGHTER, INFRINGING UPON [DEFENDANT'S] RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST.[] AMENDS. V, VI, AND XIV; N.J. CONST.[] ART. I, ¶¶ 1, 8, 9, 10 (NOT RAISED BELOW).

POINT IV

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS INFRINGED UPON [DEFENDANT'S] RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST.[] AMENDS. V, VI, AND XIV; N.J.

CONST.[] ART. I, ¶¶ 1, 8, 9, 10 (NOT RAISED BELOW).

In A-2099-23, Leon raises the following points for our consideration:

POINT I

DETECTIVE TURNER OFFERED SO MANY IMPROPER LAY OPINIONS REGARDING FACTUAL MATTERS IN DISPUTE, IN DIRECT VIOLATION OF THE THEN-RECENT OPINION IN STATE V. WATSON,[1] THAT DEFENDANT'S CONVICTIONS SHOULD BE REVERSED AS A MATTER OF PLAIN ERROR. (NOT RAISED BELOW).

POINT II

THE ACCOMPLICE-LIABILITY INSTRUCTION FAILED TO EXPLAIN HOW, UNDER STATE V. BRIDGES,[2] DEFENDANT COULD BE AN ACCOMPLICE TO A LESSER-INCLUDED HOMICIDE OFFENSE THAT REQUIRES A RECKLESS STATE OF MIND, NOT A PURPOSEFUL ONE – INSTEAD TELLING THE JURY THE NON SEQUITUR THAT THE ACCOMPLICE MUST PURPOSEFULLY INTEND A RECKLESS DEATH. (NOT RAISED BELOW).

POINT III

THE JURY INSTRUCTIONS ON CONSPIRACY TO MURDER FAILED TO RESTRICT THOSE

---

[1] 254 N.J. 558 (2023).

[2] 254 N.J. Super. 541 (App. Div. 1992), aff'd in part, rev'd in part on other grounds, 133 N.J. 447 (1993).

CONSPIRACIES TO AGREEMENTS TO PURPOSELY KILL, INSTEAD EXPANDING THE DEFINITION OF THE CRIME TOO FAR TO INCLUDE AGREEMENTS TO KNOWINGLY KILL OR TO PURPOSELY OR KNOWINGLY SERIOUSLY INJURY SOMEONE. (NOT RAISED BELOW).

POINT IV

THE TRIAL JUDGE SHOULD HAVE ENFORCED THE PLEA AGREEMENT AND RECOGNIZED THAT DEFENDANT PROPERLY PLED GUILTY TO A LESSER OFFENSE PURSUANT TO THAT AGREEMENT.

POINT V

THE 30-YEAR, 85% WITHOUT PAROLE, SENTENCE IMPOSED FOR AGGRAVATED MANSLAUGHTER IS MANIFESTLY EXCESSIVE.

Having considered the arguments and applicable law, we affirm Thomas's convictions and sentence, but vacate Leon's judgment of conviction and remand for enforcement of the plea agreement and resentencing pursuant to the agreement.

## I.

On December 2, 2021, defendants and others were charged in a Passaic County indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1), :11-3(a)(2), and :2-6 (count one); first-degree conspiracy to commit murder,

7

N.J.S.A. 2C:5-2(a), :11-3(a)(1) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count three); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count four). Pre-trial, the trial judge granted the State's motion to admit evidence of defendants' gang affiliation and Carswell's previous shooting pursuant to N.J.R.E. 401, 403, and 404(b). After defendants' respective severance motions were denied, a joint trial proceeded on various dates between September 13 and October 13, 2023. We glean these facts from the trial record.

Before 7:00 p.m. on May 1, 2021, members of 5-Deuce fired shots into a crowd gathered at a memorial shrine at the intersection of Totowa and Redwood Avenues in Paterson intending to shoot members of the 493 gang as retaliation for the September 2020 shooting that wounded Carswell, known as "Big Homie." When Paterson Police Department (PPD) Sergeant William Niebanck encountered the group, he observed "young adolescents, running from Redwood Avenue onto Totowa Avenue, towards Albion [Avenue]." The individuals appeared to be "scared," and Niebanck heard them yelling, "guns, guns, they got guns, they're going to kill us."

As Niebanck drove onto Redwood Avenue, he "hear[d] multiple gunshots" and observed "a young Hispanic male who came running up Redwood Avenue,

8

turned onto Totowa Avenue, and fell, . . . right in front of [Niebanck's] patrol unit." After calling for emergency medical assistance and back up, Niebanck examined the victim. Niebanck testified the victim, who was later identified as Jose Figeuroa, "a gang member," had been shot in the back and "was not breathing." A subsequent autopsy revealed that Figeuroa died from "a gunshot wound to the torso."

PPD Detective Wouciech[3] Kulbabinski was one of the responding officers. He testified the scene was "[h]ectic" and there was a "crowd forming" of what he estimated to be "close to 100 individuals." After the officers secured the scene, they proceeded to gather evidence. Detective Raymond Cusack of the PPD's Crime Scene Investigation Unit took photographs of evidence found at "two or three different locations." Cusack documented that police found: a "black face mask" with "suspected blood on it," a "red Apple iPhone," and a black and pink purse at Totowa and Redwood Avenue; "[.]380 auto cartridge casings" in front of 15 Redwood Avenue; a "black hoodie sweatshirt," a "blue surgical mask," a "black right[-]handed glove with the word edge . . . written on it," and a "Smith & Wesson 38 Special revolver" with five spent cartridge casings in the backyard of 29 Redwood Avenue; four cartridge casings, one "of

---

[3] The detective's first name has multiple spellings in the record.

an unknown caliber" and the others "9 millimeter Luger cartridge casings" at 425 Totowa Avenue near Albion Avenue; "a pair of Grease Monkey gloves" at 27 Redwood Avenue; and a "gray . . . hoodie sweatshirt," "a black face mask," a Yankees hat, and a "black leather jacket" in the side yard of 67 Henry Street. The items were sent for testing, but no DNA or fingerprints from any of the items linked defendants to the shooting.

PPD Detective Michael Turner was the lead detective who oversaw the case. Turner testified that after gathering the physical evidence from the surrounding neighborhood, the police obtained video surveillance footage from the area.[4] According to Turner, footage from 14 Albion Avenue facing Totowa Avenue showed "two males" "wearing black clothing" "walking up Albion Ave[nue], [who] turn around" and then "go into a rear yard on Albion Ave[nue]" around 6:30 p.m. on May 1, 2021. Describing the video, Turner said, "you will see both males walk up the sidewalk, cross the street on Albion Ave[nue] to the other side, you'll see them stand in front of a residence over there" and "[a]t some point, they'll go down an alleyway in between two residences." Turner

---

[4] All the surveillance videos were entered into evidence at trial and played for the jury.

A-2098-23

estimated the two males were in the alleyway between "3 and 5 Albion Ave[nue]" for "seven minutes."

Turner indicated the video then showed the two males come out of the alleyway and sit on a set of stairs at a house until about 6:56 p.m. Turner said that "a few moments later" the video depicted the males "cross the street, raise their arms and then flee down Albion Ave[nue] back towards Henry Street." While the activity on Albion Avenue was occurring, Turner testified "another shooting [was] occurring." According to Turner, on the video surveillance from 69 Henry Street, he heard "two shootings . . . , the first one followed by the second one . . . seconds later" around 6:57 p.m. Turner testified "[a] few moments later," after the shots are heard on the 69 Henry Street video, "you see three male parties exit out the backyard of 33 Redwood Ave[nue]" and "run across the street in between . . . 69 and 67 Henry Street in the alleyway." Turner said "you can see them drop clothing in the alleyway" that was later recovered from the scene.

Turner testified video surveillance from 26 Redwood Avenue showed the same "three suspects" crossing the road onto Redwood Avenue near 15 Redwood Avenue where the police found spent shell casings. Turner indicated the three individuals in the 26 Redwood Avenue video "were wearing all black" but

11

"[t]hey were wearing different colored clothing" in the 69 Henry Street video. According to Turner, surveillance video from 53 Redwood Avenue showed "the three parties jumping a fence from one backyard into another."

Turner further testified video surveillance from 34 Sherman Avenue showed a vehicle police "believed was involved." The vehicle was "a white Kia Optima" with "a black sticky[-]like substance, almost like a sticker near the license plate on both sides" of the back of the car. It "also had a silver sticker in the rear bottom left-hand corner of the rear window" and "[d]ark tinted windows." According to Turner, the surveillance footage showed the white Kia drop off two individuals "matching the description of the two individuals later seen on Albion Ave[nue]." Turner believed the two people who exited the Kia "were the shooters from Albion Ave[nue]."

Turner testified on May 3, 2021, two detectives were canvassing the area of the shooting when they "noticed a vehicle matching th[e] description" of the Kia. They "conduct[ed] a motor vehicle stop" and found two occupants—the driver, identified as co-defendant Chelsee Ramirez, and the passenger, a juvenile referred to in the record as M.J.[5] Ramirez was the registered owner of the Kia.

_____

[5] We use initials to remain consistent with the proceedings and record.

A-2098-23

Although Turner considered Ramirez and M.J. "persons of interest," neither was charged on that day, and both were released.[6]

According to Turner, by May 4, 2021, the police "believed . . . there were five shooters" involved, but they did not know their identities. As a result, the police "obtained more video footage" showing the "three suspects" from Redwood Avenue walking on various streets and residences in the surrounding neighborhood, with one individual wearing a Yankees hat and another wearing one of the jackets that had been recovered by police on the night of the shooting. Turner stated surveillance video from Jasper Street showed "those same three male parties" in the backyard of a house on Jasper Street "for an extended period of time." According to Turner, "[i]n that video, one of those males is seen with a silver object in his hand that he puts in his waistband and then those males are seen walking up the side of that residence to the front of the residence on Jasper Street."

Turner created "two compilation videos," one depicting "the suspects from the Redwood Ave[nue] location" and one depicting the "suspects [from] the Albion Avenue location." Both compilation videos were played for the jury at

---

[6] Ultimately, evidence obtained from the execution of search warrants for both Ramirez's and M.J.'s cell phones, including text messages, led to their arrests.

A-2098-23

trial. Turner testified based on his review of the video footage, the police theorized the three suspects from Redwood Avenue came from Garrison Street, as did the white Kia that dropped off the two suspects believed to be the shooters on Albion Avenue. Further, based on what police had "found at the scene, and where . . . Figueroa was located," police "determined . . . the bullet that was shot that struck and killed" Figueroa "came from someone who was on Redwood" Avenue.

From June through September 2021, the police arrested and charged several individuals in connection with Figueroa's murder, including Ramirez, M.J., Morales, and Jenna Peselli, all members of 5-Deuce. M.J., Morales, and Peselli were all charged with murder and received plea deals in exchange for testifying at trial against defendants. M.J. pleaded guilty to conspiracy to commit murder and received four years in a juvenile detention center in exchange for his testimony. Morales also pleaded guilty to conspiracy to commit murder and received a seven-year prison sentence. Peselli pleaded guilty to conspiracy to commit aggravated assault and received a three-year prison sentence. Their testimony provided the following details of the May 1, 2021 shooting at trial.

A-2098-23

M.J. and Peselli, who had an "on-and-off relationship" with Leon, confirmed at trial that defendants were both 5-Deuce members. Morales described 5-Deuce's ranking system, stating he was a "tiny loc," which was the lowest rank. According to Morales, the "two main" jobs of the tiny locs were "getting money" and "selling drugs." Other than that, the tiny locs were to "wait until nighttime and find one of the opps, which are [5-Deuce's] rivals." Above a tiny loc was a "BG," which M.J. described as an "enforcer" to keep the tiny locs "in line." Above the BG was the "YG," who was "somebody that takes care of business," meaning "go shoot at people or take care of any necessary beef." Above the YG was Carswell, "[t]he Big Homie" and the leader of 5-Deuce.

Morales, M.J., Peselli, Leon, Mick Cadet, Jeremiah Rivera, and Shannar Collins were all tiny locs. Thomas was a BG. M.J. testified that he and Thomas had a "friendly relationship" and that he texted Thomas "[a]lmost every day." Ramirez was M.J.'s girlfriend and "the first lady" of 5-Deuce, or the "leader for the female[s]." M.J. estimated there were over "a hundred" 5-Deuce members. He testified if the tiny locs did not do as they were told by a higher-ranking member of 5-Deuce, they "would be jumped," meaning they "would get disciplined." Peselli confirmed that a lower-level member would "get jumped

15

by two people," which entailed "two people fight[ing] one person," if they did not do what they were told.

M.J. testified that on May 1, 2021, he and Ramirez were heading back to his house on Redwood Avenue in Ramirez's Kia. When they got to Redwood Avenue, M.J. saw 493 gang members "having a memorial" at the corner of Redwood and Totowa Avenues. The 493 gang was considered 5-Deuce's rival because 493 members had shot Carswell back in 2020. M.J. testified 5-Deuce's "ultimate goal" was "[t]o get [493] out of the way" by "[s]hoot[ing] at them" and "[t]he objective was to kill them."

M.J. stated Thomas told 5-Deuce members to look for and retaliate against 493 members because "[h]e was just angry." According to M.J., Thomas would "tell all the homies that we had to get back at them for the Big Homie." As a result, M.J. and other 5-Deuce members would look for 493 members "every day." Morales similarly testified that Thomas wanted 5-Deuce "to get 493" for shooting at Carswell. Peselli confirmed that 5-Deuce members "felt like there needed to be retaliation for what had happened to . . . Carswell."

M.J. testified that as soon as he saw 493 members on Redwood Avenue, he started sending out texts to 5-Deuce members that the "opps w[ere] on Redwood." At 5:04 p.m., Rivera responded to M.J., indicating "[o]pps on

16

Redwood, mandatory slide" which, according to M.J., meant that "the opposition was on Redwood and it was mandatory for us to handle that." Around the same time, Rivera directed M.J. to "[c]ome to G block," indicating Garrison Street, and stated, "Everyone here, meeting here."

At approximately 5:41 p.m., Thomas texted M.J. that "493 members are in the hood."[7] According to M.J., he knew the text came from Thomas because he "recognize[d] . . . his phone number," having talked to Thomas "[a]lmost every day." M.J. responded he had contacted the other tiny locs, but no one had answered him. M.J. texted Thomas he had a .38 caliber gun. Thomas directed M.J. to "go get the guns" and "go do something," meaning "go shoot at" the 493 members. M.J. testified that after arriving at Garrison Street, Thomas told him "to . . . retrieve a gun." M.J. "went and retrieved" a ".38" "revolver" from a laundromat on Union Avenue and "handed the gun to . . . Thomas." M.J. said he then went back to Ramirez's car and "waited."

Morales testified he received a call from Thomas who told him to "come to the block, it's mandatory." Morales had an Uber drop him off on Kearney Street and he walked the rest of the way to Garrison Street. He was wearing "all

_____

[7] The text messages were admitted into evidence. After Leon's arrest, a search of his phone revealed nothing of evidential value and a forensic search showed the phone was not in the area of the shooting at the time in question.

17

black."  On the way to Kearney Street, Morales saw 493 members "on Redwood and Totowa."  He saw about twenty 493 members and believed Thomas was "gonna have [them] slide," which meant "shoot at them."  When Morales arrived at Garrison Street, defendants and a few other 5-Deuce members were already there.  According to Morales, Thomas was running the meeting.

Morales testified upon arrival, he "and the rest of the crew" received guns from Thomas.  Thomas had retrieved the guns "from . . . Cadet's house" where Thomas had been "renting" a room.  Morales said Thomas gave guns to him, Rivera, Collins, and Leon.  According to Morales, at the meeting, Thomas told him, Rivera, and Collins "to go by Redwood [Avenue]" and "once you get close to where [the 493 members were], just start shooting."  Thomas further directed "once [the 493 members] make a right [Leon] is going to be . . . around the corner."  Morales said Thomas instructed Leon "to go by Albion [Avenue], like around [the] corner from where [the group] w[as] at."  Morales testified Cadet went with Leon so he would not be by himself.  Morales also said Thomas told Ramirez "to drop" Leon and Cadet off near Albion Avenue, and confirmed Ramirez drove a "[m]ostly white . . . Kia."  According to Morales, Thomas gave everyone instructions on their respective roles and where to go.

18

Peselli testified she had been on Garrison before and during the meeting. Peselli said Ramirez had told her that "there was going to be some kind of retaliation" against "493." Peselli confirmed Thomas was leading the meeting "for the males," and Ramirez was leading the meeting "for the females." Peselli also indicated Thomas was talking with Leon, Cadet, Rivera, Collins, and Morales during the meeting, but Peselli could only hear "[b]its and pieces" of the conversation. Peselli did confirm that Collins, Morales, and Rivera were going to Redwood Avenue, and Leon and Cadet were going to Albion Avenue. According to Peselli, "[t]hey were supposed to shoot" and "the three people that were on Redwood" Avenue were supposed to shoot first. Peselli acknowledged she was never on either street during the shooting.

M.J. testified while he and Ramirez were waiting in the Kia, Leon and Cadet "got in the back seat." Ramirez and M.J. then dropped off Leon and Cadet near "Sheridan" Avenue "[b]ecause they were going to do the shooting." Although M.J. had not been explicitly told that, he "[j]ust put two and two together." M.J.'s understanding was that Leon and Cadet would "just . . . set off the shots" so that "493" members "could scatter." Once M.J. and Ramirez dropped off Leon and Cadet, M.J. said they started "circl[ing] the area" in the Kia. Peselli had volunteered to pick up Leon and Cadet and also began driving

19

around the Garrison Street neighborhood in Thomas's car, a "[s]ilver" "Nissan," but parked after driving around for about ten minutes because she was told by Ramirez she "was making it hot."

Morales testified after leaving the meeting on Garrison Street, he, Rivera, and Collins "start[ed] hopping out through houses" to get to Redwood Avenue. Once they got there, they all "just started letting off shots." After the shooting on Redwood Avenue, Morales, Rivera, and Collins started running back the same way they had arrived and "ended up" in a backyard "by . . . Albion [Avenue] and Union Ave[nue]." They remained there "for . . . two hours." While there, Morales, Rivera, and Collins "change[d their] clothes."

M.J. testified that, after the shootings, "nobody could find" Morales and Rivera. Around 7:31 p.m., Thomas texted M.J. he was looking for Morales and Rivera and indicated "they need to hurry up and get out of the area before the dogs start searching the area." Morales stated after standing in the backyard near Albion and Union Avenues for about two hours, he saw "one of the homeless people that used to . . . buy[] drugs off [Thomas]" and used that person's phone to call Thomas. Morales testified Thomas told him he would send Ramirez to pick him, Rivera, and Collins up. M.J. confirmed he and Ramirez picked them up near "Union Ave[nue]." Morales said he gave his gun,

"a Glock 42," and Rivera's gun, "a Ruger," to M.J. Ramirez then dropped off Morales, Rivera, and Collins at their homes.

M.J., Morales, and Peselli all admitted on cross-examination that they had initially lied to police and claimed they were not involved in the May 1, 2021 shooting. M.J. acknowledged he would receive his plea deal if the prosecutor's office "liked what [he] told them," but maintained he "just told them the truth." Similarly, Morales acknowledged the deal "was actually to tell the truth." Peselli admitted she went to the prosecutor to try to get a deal after she saw that M.J. had received one. She explained she initially lied to police because she "was scared to go to jail" "[b]ecause [she had] never been in a situation like this before."

The parties stipulated that at around 7:36 p.m. on September 30, 2023, Thomas made a phone call from jail to someone named "Straps" with instructions for Morales. The call was played for the jury at trial. In the call, Thomas told Straps to tell Morales to testify that Thomas "wasn't there" on Garrison Street the day of the shooting. He further instructed that Morales "need[ed] to say" Cadet "g[o]t the [gun]" from Cadet's "house." Thomas also told Straps Morales "need[ed] to say that [M.J.] told him the plan and said that it came from me."

21

In the call, Thomas directed Straps to tell Morales "don't fold while he's there" testifying in court and that Morales should "write this shit down and practice this shit, bro." Thomas reiterated the "main" instruction was for Morales to say that "when he got there[,] he did not see [Thomas] on G block," and that when asked why the other witnesses and Morales had said that Thomas was on Garrison Street, to say that M.J. "was telling" Morales that he was. On redirect examination, Morales confirmed that Thomas wanted him "[t]o lie" by denying Thomas's involvement in the shooting but Morales maintained that his trial testimony was accurate and that Thomas had planned the shooting.

The jury convicted Thomas of all four counts. The jury found Leon not guilty of first-degree murder, but guilty of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and the remaining three counts. After appropriate mergers, Thomas was sentenced to forty years in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for murder (count one), and a consecutive ten-year prison term, with a five-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), for unlawful possession of a weapon (count four). Leon was sentenced to a thirty-year prison term, subject to NERA, for aggravated manslaughter (count one), and a

22

concurrent five-year prison term, with a forty-two-month period of parole ineligibility pursuant to the Graves Act, for unlawful possession of a weapon (count four). The judge entered a conforming judgment of conviction for Thomas on March 6, 2024, and for Leon on February 27, 2024. These appeals followed.

## II.

Leon argues in Point IV of his merits brief that the judge should have enforced his plea agreement because he properly pled guilty to first-degree conspiracy to commit murder pursuant to the terms of the plea agreement. We agree the judge erred in refusing to accept Leon's guilty plea.

On March 1, 2023, nearly six months before trial, Leon executed a plea agreement with the State in which he agreed to plead guilty to count two, first-degree conspiracy to commit murder, in exchange for the prosecutor recommending a maximum ten-year prison sentence, subject to NERA. The plea form specified sentencing in the second-degree range, see N.J.S.A. 2C:44-1(f)(2), and indicated defendant was "free to argue for [a] lesser sentence." As to "any other promises or representations . . . made by you, the prosecutor, your defense attorney, or anyone else as a part of this plea of guilty," the plea form indicated there were none.

23

At the ensuing plea hearing, the prosecutor confirmed that Leon "agree[d] to retract his plea of not guilty and plead to [c]ount [two,] . . . charging him with first-degree conspiracy to commit murder." The prosecutor added that the "charge will be sentenced as a second-degree" and "the State's recommendation [was ten] years, subject to [NERA], at which point he will have to serve five years under parole supervision once released." In response to the judge's question, defense counsel agreed the prosecutor had recited "the complete plea bargain."

After being sworn, Leon told the judge he understood the plea agreement, went over the agreement with his counsel, and signed the agreement of his own free will. He acknowledged the answers on the plea form were his answers and were accurate answers. He stated he understood the nature of the charge and the consequences of his plea and that he was pleading guilty voluntarily. He confirmed he was pleading guilty to first-degree conspiracy to commit murder and understood the sentence the State was recommending.

Prior to eliciting a factual basis for the plea, Leon engaged in the following colloquy with his attorney:

> [DEFENSE COUNSEL]: Mr. Leon, we . . . spoke many times about your case. Is that correct?
>
> [DEFENDANT]: Yes.

24

[DEFENSE COUNSEL]: And we talked about possible defenses, we talked about what we did or what we would do if this case was to go to trial. Is that correct?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: You made it very clear to me that you were interested in accepting a plea, but that plea could not entail you testifying against the people you were with. Is that correct?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And I was able to accomplish that, I think you're paying the price for it. But it's my understanding you do not want to testify against anyone. Is that correct?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: I explained to you that this plea agreement which is pleading guilty to a first-degree carries between five and [ten] years. State's asking for the full [ten]. Naturally, I'm going to ask for less. It's going to be up to the judge to decide. But had you agreed to testify, you probably could have been five or less. Do you understand that?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And you understand that and it's your position that you're going to take your medicine, so to speak. You don't want to tell on anybody and you're going to plead guilty. Is that correct?

[DEFENDANT]: Yes.

25

Turning to the offense, upon further questioning by his attorney, Leon admitted that, on May 1, 2021, he, Thomas, Cadet, Morales, Collins, Peselli, and Ramirez agreed that there was going to be a shooting. He confirmed he and these individuals met on Garrison Street and were planning on shooting and killing the "[o]pps" on Redwood Avenue. He explained

> the plan was that [he was] going to go towards one area where the [o]pps were hanging out and the other group of people would go to the other area and [they] would both fire in the direction of the . . . [o]pps, and it was practically certain that one of them would be struck with a bullet.

He stated after the plan was agreed upon, he and Cadet got into Ramirez's car. He confirmed that M.J. was also in the car and provided him with a handgun, specifically a "9-millimeter." He acknowledged "some other individuals . . . had other guns." He stated after he got out of Ramirez's car, he "went from Sherman Ave[nue] to Albion Ave[nue] and . . . sat on the steps with . . . Cadet." According to Leon, "once [they] heard the gunshots, that's when [they] ran and [he (Leon)] started shooting too." He acknowledged although he did not "hit" any of the opposition members, he had agreed with the 5-Deuce members to commit murder, and he was certain or practically certain that death to the opposition would result from the plan.

26

In response to defense counsel's question, the prosecutor indicated he was "satisfied" with the factual basis for Leon's guilty plea. However, the judge interjected:

> THE COURT: Okay. There's no neutralizing statement that you're taking from him, even though he's not testifying? I'm just asking. Is there a neutralizing statement that's being taken?
>
> [PROSECUTOR]: Well, Judge, I think based on the—
>
> THE COURT: Are you satisfied that that's covered in the allocution?

Before the prosecutor could respond, Leon's counsel asked Leon, "Well—okay. And as I indicated to you, . . . there's no question that the individuals that I named, and I'm going to name them again, Jaquan Thomas a/k/a Dex, he was all part of this conspiracy. Am I correct?" Leon responded, "I ain't saying nothing." When asked again by his counsel whether Thomas "was part of the conspiracy," Leon again stated, "I ain't saying nothing." The judge then gave Leon and his counsel time to talk off the record. When the record resumed, the judge had moved on to Cadet's plea hearing.

When Cadet's attorney attempted to elicit a factual basis during Cadet's plea hearing, Cadet attributed the planning of the shooting to M.J., not Thomas. At that juncture, the prosecutor told the judge he was not satisfied with Cadet's

27

factual basis and requested time to consult with defense counsel, which the judge granted. The proceedings never resumed. The judge later stated on the record, "we paused in the middle of [Leon's and Cadet's] allocutions for whatever reasons" and "[t]he State's not satisfied" and "requested a little bit more time." However, the prosecutor never expressed any objection to Leon's factual basis on the record, only to Cadet's. The March 1, 2023 hearing ended without the judge accepting Leon's guilty plea or making any factual findings regarding Leon's plea.

Leon later moved to enforce his March 1, 2023 plea agreement. After hearing argument on July 10, 2023, during which both Leon and the State were represented by new attorneys, the judge denied the motion. In an oral opinion, the judge found "there was no meeting of the minds." The judge stated her "understanding" was that Leon was "suppose[d] to provide a neutralizing statement" or "testify." However, according to the judge, "[h]e completely backtracked[ and] changed his mind."

The prosecutor confirmed that based on his "discussions" with the prior prosecutor who had represented the State at Leon's initial plea hearing, the judge's understanding of the terms was accurate but "the plea form had it more simplified." Leon's counsel asserted his "understanding of" Leon's plea "was

ten years with neutralization, specifically, as opposed to cooperation," but the neutralizing statement "was to be the factual basis that [Leon] put on the record during the . . . plea allocution." Defense counsel added Leon's factual basis satisfied the elements of the offense and should have been accepted by the judge.

In contrast, the judge found Leon's "plea bargain called for an allocution and a neutralizing statement or cooperation, whichever was . . . defendant's choice." According to the judge, Leon's former counsel "had lengthy conversations with the State about" Leon having to give a neutralizing statement. The judge added "they talked about it even though it may not be . . . on the record." The judge acknowledged the "transcript" of the plea hearing "looked like [the prosecutor] was satisfied with the allocution," but Leon was "suppose[d] to provide a neutralizing statement." The judge acknowledged it was "unfortunate that we didn't put anything on the record" but "[t]he agreement was always that [Leon] would either neutralize . . . or testify."

The judge explained she "didn't accept the plea," "make any findings," or give Leon "a sentence date" so there should be no misunderstanding on Leon's part "that he had accepted a plea bargain." When defense counsel asked the judge "what exactly . . . Leon was suppose[d] to do that he didn't do," the judge replied Leon should have provided "detailed information about who called the

29

shots, when, who did what, and why, and that . . . Thomas was fully aware and the head honcho, and it was called by him because of a shooting for another homey in the past."  When the judge asked the prosecutor if that recitation of the anticipated neutralizing statement was accurate, he responded, "that's my understanding."

We review a trial court's refusal to accept a plea under an abuse of discretion standard.  State v. Daniels, 276 N.J. Super. 483, 487 (App. Div. 1994). "While it is certainly true that a trial court has wide discretion in deciding whether to accept a plea, . . . [j]udicial discretion is not unbounded and it is not the personal predilection of the particular judge."  State v. Madan, 366 N.J. Super. 98, 108-09 (App. Div. 2004).  Instead, "judicial discretion means legal discretion in the exercise of which the court must take account of the law applicable to the particular circumstances of the case and be governed accordingly.  Implicit is conscientious judgment directed by law and reason and looking to a just result."  Id. at 110 (emphasis omitted) (quoting In Wasserstein v. Swern & Co., 84 N.J. Super. 1, 6 (App. Div. 1964)).

"Plea bargaining has become firmly institutionalized in this State as a legitimate, respectable[,] and pragmatic tool in the efficient and fair

administration of criminal justice." State v. Means, 191 N.J. 610, 618 (2007) (quoting State v. Taylor, 80 N.J. 353, 360-61 (1979)).  Pursuant to Rule 3:9-2:

> [t]he court, in its discretion, may refuse to accept a plea of guilty and shall not accept such plea without first questioning the defendant personally, under oath or by affirmation, and determining by inquiry of the defendant and others, in the court's discretion, that there is a factual basis for the plea and that the plea is made voluntarily, not as a result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea.

"The factual basis 'provides a record for appellate review if the plea is later challenged and gives a court the opportunity to evaluate the conditions under which a plea is made.'"  State v. Campfield, 213 N.J. 218, 230 (2013) (quoting State ex rel. T.M., 166 N.J. 319, 326 (2001)).  "[O]ur law requires that each element of the offense be addressed in the plea colloquy."  Id. at 231.  In doing so, the defendant "may either explicitly admit guilt with respect to the elements or may 'acknowledge[] . . . facts constituting the essential elements of the crime.'"  Ibid. (alteration and omission in original) (quoting State v. Sainz, 107 N.J. 283, 293 (1987)).  "The trial court must overcome 'a defendant's natural reluctance to elaborate on the details,' and reject a guilty plea absent the defendant's admission of 'the distasteful reality that makes the charged conduct criminal.'"  Ibid. (quoting T.M., 166 N.J. at 334-35).

31

"[T]o safeguard a defendant's constitutional rights, a plea agreement must generally be enforced according to its terms, without implying unstated terms favorable to the State and unfavorable to the defendant." State v. Conway, 416 N.J. Super. 406, 411 (App. Div. 2010) (citing Means, 191 N.J. 610). "The terms of a plea agreement must be carefully adhered to; the reasonable expectations of a defendant generated by the plea negotiations should be 'meticulously' met." State v. Salentre, 242 N.J. Super. 108, 111 (App. Div. 1990).

It is also "axiomatic in plea bargaining that all material terms and relevant consequences be clearly disclosed, fully understood, and knowingly and voluntarily accepted by the defendant." Conway, 416 N.J. Super. at 412 (quoting State v. Warren, 115 N.J. 433, 444 (1989)). To that end, "[a]ll of the terms of the plea [agreement] . . . shall be placed on the record in open court at the time the plea is entered." Salentre, 242 N.J. Super. at 113 (second alteration and omission in original) (quoting R. 3:9-2(c)). Although "[n]otions of fairness apply to each party in the [plea] bargaining process," "the defendant's constitutional rights and interests weigh more heavily [o]n the scale." Warren, 115 N.J. at 443.

"Generally, once an agreement is reached and the defendant pleads guilty, '[d]ue process concerns . . . inhibit the ability of the prosecutor to withdraw from

a guilty plea.'" Means, 191 N.J. at 618 (alteration and omission in original) (quoting Warren, 115 N.J. at 445). "Those due process 'concerns have mostly to do with the voluntary and knowing waiver by the defendant of constitutional rights, which is the basis for entering a guilty plea.'" Ibid. (quoting Warren, 115 N.J. at 445).

Leon argues the judge should have accepted his guilty plea because he provided an adequate factual basis for first-degree conspiracy to commit murder. Leon's signed plea agreement indicated he would plead guilty to first-degree conspiracy to commit murder in exchange for the prosecutor recommending a ten-year NERA sentence. At the plea hearing, the prosecutor confirmed on the record those were the terms of the plea agreement. Although the judge did not accept the plea because Leon did not provide an adequate "neutralizing statement" addressing Thomas's involvement as the mastermind behind the conspiracy, the executed written plea agreement makes no reference to Leon giving a neutralizing statement as a condition of the plea. Indeed, the plea form indicated there were no "other promises or representations" made as part of the plea agreement.

Further, when asked by the judge to place the conditions of Leon's plea agreement on the record, the prosecutor at the time made no mention of Leon

A-2098-23

having to give a neutralizing statement, much less a statement detailing Thomas's specific involvement as the mastermind behind the conspiracy as a condition of the plea. See Salentre, 242 N.J. Super. at 113. Four months later, at the July 10, 2023 hearing, the new prosecutor stated neutralization or cooperation were "terms" of Leon's plea agreement, but did not point to any evidence other than his own subjective belief to show that neutralization was required and admitted that the "plea form had it more simplified."

Likewise, although the judge commented the former prosecutor and Leon's prior counsel had had conversations regarding Leon's giving a neutralizing statement implicating Thomas, the judge candidly admitted at the July 10, 2023 hearing that those conversations were "not . . . on the record." Nor were there any witnesses called at the July 10, 2023 hearing to corroborate these conversations or speak to the intent of the parties in relation to the neutralizing statement. Nothing in the record before us sufficiently demonstrates that Leon had to give a neutralizing statement as part of his plea agreement. Instead, the record shows at the time Leon entered the guilty plea, all requirements under the court rules were met—the plea had an adequate factual basis, was given voluntarily, and Leon had an understanding of the nature of the charge and the

A-2098-23

consequences of the plea. Thus, we are convinced the judge misapplied her discretion when she rejected the plea.

Critically, the judge "impl[ied an] unstated term[] favorable to the State and unfavorable to the defendant" when she determined Leon had to give a neutralizing statement implicating Thomas as part of his plea. Conway, 416 N.J. Super. at 411. A neutralizing statement of the significance described by the judge at the July 10, 2023 hearing should have been "clearly disclosed," either in the plea agreement or "in the prosecutor's confirmation of the agreement on the record," neither of which occurred. Id. at 412. "In the absence of any such explicit condition," we are satisfied Leon should not have been held to it. Id. at 412-13; see Salentre, 242 N.J. Super. at 113.

In a similar case, the defendant appealed the trial court's "vacation of his guilty plea to third-degree conspiracy, entered pursuant to a negotiated plea agreement." Salentre, 242 N.J. Super. at 109. The defendant was charged in an indictment along with other co-defendants with theft-related offenses. Id. at 110. Ten days after accepting the guilty plea, the trial judge sent a letter "to defense counsel and the prosecutor stating that [the] defendant's plea had been accepted only because the judge had had the 'impression' that the two other co-defendants would also enter guilty pleas." Ibid. "Because these co-defendants

refused to tender guilty pleas, the trial judge sua sponte stated that he would vacate [the defendant's] guilty plea." Ibid. "The State concede[d] that while it had an 'impression' that the co-defendants' guilty pleas also would be forthcoming, no promises to that effect had been made by anyone. Thus, the judge had not been misled by counsel in any way." Id. at 111.

In reversing the order vacating the defendant's guilty plea, we held "the basis for rejection of the plea agreement relied upon by the . . . judge was insufficient" and "his order was a mistaken exercise of discretion." Id. at 113. We stressed "the judge's own mistaken 'impression' aborted the plea agreement" and "[p]roper procedures should be followed to avoid unilateral mistakes like this." Ibid. We explained:

> The judge['']s apparent mistaken impression that [the defendant's] plea was conditioned on all of his co-defendants pleading guilty, appears to have been an unarticulated premise, not understood as a condition precedent to the performance of the plea agreement by either the State or the defendant.
>
> The judge's position that the public interest has not been served because his own personal expectation, i.e., guilty pleas from the co-defendants, was unfulfilled and that therefore he is not bound by the acceptance of [the defendant's] plea, is both untenable and violative of defendant's rights. The standard implicated for the withdrawal of guilty pleas dictates that if at the time of sentencing the judge determines that "the interests of justice" will not be served by

36

> effecting the plea agreement, the judge may vacate the plea or the defendant shall be permitted to withdraw his plea. R. 3:9-3(e). This rule affords only the defendant the opportunity to move for withdrawal of a guilty plea. Warren, 115 N.J. at 443. The State does not have a reciprocal right to repudiate the plea agreement. Id. at 444.
>
> [Salentre, 242 N.J. Super. at 111-12 (citation reformatted).]

The same principles apply here. The judge's "own personal expectation" that Leon had to give a neutralizing statement detailing Thomas's involvement as the mastermind of the conspiracy "appears to have been an unarticulated premise" not supported by the record, not indicated on Leon's signed plea agreement, and not expressed as a condition when the original prosecutor placed the conditions of the plea on the record. Id. at 111. As in Salentre, the judge's "own personal expectation" that Leon was bound by a condition that was never memorialized erroneously "aborted the plea agreement." Id. at 111, 113.

To support the judge's rejection of Leon's plea, the State posits Leon's counsel admitted at the plea enforcement hearing that Leon had to give a neutralizing statement as part of his guilty plea. Although Leon's new counsel agreed a neutralizing statement was part of his guilty plea, his position was that the factual basis Leon provided at his initial plea hearing sufficed. To that end, in providing his factual basis, Leon agreed that Thomas was involved in the May

1, 2021 shooting. Although he said he "ain't saying nothing" when later asked whether "Thomas . . . was a[] part of this conspiracy," at that point he had already admitted to Thomas's involvement. That admission, along with Leon's subsequent admissions about his own conduct and involvement in the May 1, 2021 shooting, was sufficient to neutralize Leon as a defense witness.

Following the rejection of his guilty plea, Leon went to trial and was convicted of aggravated manslaughter and two related weapons offenses in addition to the conspiracy charge to which he had been willing to plead guilty. He was sentenced to an aggregate thirty-year NERA sentence, a sentence significantly higher than the ten-year NERA sentence contemplated under the plea agreement. "An error-free trial following the erroneous rejection of a plea agreement does not cure the pretrial error." Madan, 366 N.J. Super. at 115. "Nor does the erroneous rejection of a plea agreement serve the legitimate 'mutuality of advantage' a plea affords to both the defendant and the State." Ibid. Accordingly, Leon's judgment of conviction is vacated, and we remand for the enforcement of the plea agreement entered by defendant and the State and resentencing in accordance with the plea agreement. See Conway, 416 N.J. Super. at 413. Based on our decision, we need not address Leon's remaining arguments raised on appeal.

A-2098-23

## III.

Thomas argues in Point I the judge improperly admitted other-bad-act evidence against him and failed to give the jury the necessary instruction about the evidence.

Before trial, the State moved to admit evidence of defendants' gang membership as well as evidence of Carswell's 2020 shooting pursuant to N.J.R.E. 404(b). After hearing argument, the judge entered an order on December 13, 2022, granting the motion. In an oral opinion, applying the familiar four-factor State v. Cofield, 127 N.J. 328, 338 (1992), analysis, the judge found the evidence of defendants' gang affiliation relevant to "motive, . . . plan, opportunity, [and] intent for the murder of Jose Figueroa." Based on M.J.'s, Morales's, and Peselli's testimony, as well as "corroborative" evidence from Ramirez's and M.J.'s cellphones, the judge also found there was "clear and convincing evidence" establishing defendants "were members of the [5-Deuce] gang," "that one of their members, Carswell, was shot by members of the 493 gang," and that Thomas had devised a plan to retaliate. Lastly, the judge concluded the prejudice was "outweighed by the probative value of the evidence" to explain the connection between Thomas and the actions of the co-defendants.

39

Our standard of review is well established.

> Appellate review of a trial judge's determination on the admissibility of "other bad conduct" evidence is one of great deference. State v. Foglia, 415 N.J. Super. 106, 122 (App. Div. 2010). "Only where there is a 'clear error of judgment' should the 'trial court's conclusion with respect to that balancing test' be disturbed." State v. Marrero, 148 N.J. 469, 483 (1997) (quoting State v. DiFrisco, 137 N.J. 434, 496-97 (1994))). However, if the trial court admits evidence of other bad acts without applying the four-step Cofield analysis, the trial judge's determination does not receive deference and the reviewing court reviews the issue de novo. State v. Darby, 174 N.J. 509, 518 (2002); Foglia, 415 N.J. Super. at 121-23.
>
> [State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010) (citations reformatted).]

N.J.R.E. 404(b) states:

> (1) Prohibited Uses. – Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.
>
> (2) Permitted Uses. – This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

In Cofield, our Supreme Court set forth a four-factor test to govern the admissibility of evidence under N.J.R.E. 404(b)(2), requiring that:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338.]

The second Cofield factor "need not receive universal application in Rule 404(b) disputes." State v. Williams, 190 N.J. 114, 131 (2007).

N.J.R.E. 404(b) is based on the recognition "of both the inordinate prejudice to the defendant inherent in other-crimes evidence and, at the same time, the utility of that evidence to the prosecution when it is fairly probative of defendant's guilt of the crime charged and not merely of his propensity to commit crime." State v. Hernandez, 334 N.J. Super. 264, 269 (App. Div. 2000), aff'd as modified, 170 N.J. 106 (2001). "The underlying danger of admitting other-crimes evidence is that the jury may convict the defendant because he [or she] is 'a bad person in general.'" Cofield, 127 N.J. at 336 (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)) (internal quotation marks removed). "The risk involved with such evidence is 'that it will distract a jury from an independent

41

consideration of the evidence that bears directly on guilt itself.'" Goodman, 415 N.J. Super. at 227 (quoting State v. Vallejo, 198 N.J. 122, 133 (2009)).

Here, Thomas argues the judge erred in permitting Morales to testify to three specific instances of "damaging other-bad-act evidence": (1) that Thomas was "mostly busy . . . like selling drugs and stuff like that"; (2) "that the two main activities of the gang were selling drugs and waiting until nighttime to go find the 'opps'"; and (3) "that Thomas sold drugs to 'crack addicts' and homeless people." Thomas also argues the judge improperly allowed M.J.'s testimony that Thomas told the 5-Deuce members to look for 493 members to kill every day.

The first comment complained of, that Morales testified Thomas was "mostly busy . . . like selling drugs and stuff like that," was made at the pre-trial hearing, not in front of the jury, and thus did not prejudice Thomas at trial. The second comment, that Morales testified the "two main activities of the gang were selling drugs and waiting until nighttime to go find the 'opps'" misrepresents Morales's testimony. At trial, Morales made the comment in response to being asked what Morales could do as a tiny loc in 5-Deuce. Morales testified the "two main things" were "getting money and selling drugs" or "wait until night time and find one of the opps." Thomas objected to the testimony. The judge overruled the objection, finding it was "background information" pertaining to

42

Morales's "association with this particular gang," that had been ruled admissible during the pre-trial hearing.[8]

We agree with the judge that the testimony pertained to the tiny locs' activities, not Thomas's. The trial testimony from the other 5-Deuce members was clear that Thomas was not a tiny loc but was higher up in the 5-Deuce hierarchy. Because the testimony did not elicit any prior bad act of Thomas, it is not other-crimes evidence against him and does not implicate N.J.R.E. 404(b). See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 404 (2026-27) ("[N.J.R.E. 404(b)] applies only to other acts of the defendant; thus, evidence that includes references to bad conduct by the defendant's accomplices does not implicate this rule."); State v. Figueroa, 358 N.J. Super. 317, 326 (App. Div. 2003) (holding that a defendant's statement in which he "did not implicate himself" was "not other[-]crimes evidence as to him").

The third comment, that Morales testified "Thomas sold drugs to 'crack addicts' and homeless people," was admitted in error. Specifically, Morales testified that, after the shooting on Redwood Avenue, he, Collins, and Rivera were hiding in a backyard when Morales borrowed a phone to call Thomas from

---

[8] The trial judge was a different judge from the motion judge.

A-2098-23

"one of the crack addicts . . . that used to be buying drugs off [Thomas]." Thomas did not object to the testimony.

Thomas having previously sold drugs to the individual was not relevant to any material issue in the case and the testimony constituted impermissible other-bad-act evidence under the Cofield factors. 127 N.J. at 338. However, because Thomas did not object, we review the issue for plain error. "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Melvin, 65 N.J. 1, 18-19 (1974)). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" Ibid. (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)) (internal quotation marks omitted).

Although the fleeting portion of Morales's testimony was improper, it was a one-time comment by Morales. Critically, the State did not highlight the testimony or continue any line of questioning regarding Thomas's drug activity through either Morales or the other 5-Deuce witnesses. Thus, we are satisfied

44

the error was not clearly capable of producing an unjust result. See State v. Barden, 195 N.J. 375, 392 (2008) (explaining testimony that the defendant was involved in "numerous prior drug sales" for a period of six months prior to the offense he was on trial for was "unduly prejudicial" and therefore inadmissible).

Lastly, Thomas argues M.J.'s testimony that Thomas told the 5-Deuce members to look for 493 members to kill every day was inadmissible other-bad-act evidence. Specifically, M.J. testified 5-Deuce's "ultimate goal" was "[t]o get [493] out of the way" by "[s]hoot[ing] at them" and the "[t]he objective was to kill them." He testified Thomas was telling the 5-Deuce members to retaliate against 493 for shooting Carswell and, at Thomas's direction, M.J. and other 5-Deuce members would look for 493 members "every day." Thomas objected to the testimony. The judge allowed it because it related to the retaliation motive for Carswell's shooting, evidence permitted under the pre-trial ruling.

We agree with the judge's ruling. Under the first Cofield factor, evidence that Thomas and the other 5-Deuce members were looking for 493 members to kill every day was relevant to motive, intent, or plan for the May 1, 2021 shooting, all material issues in dispute. 127 N.J. at 338. The main focus "in determining the relevance of evidence is whether there is a logical connection between the proffered evidence and a fact in issue." State v. Garrison, 228 N.J.

A-2098-23

182, 195 (2017) (quoting State v. J.M., 225 N.J. 146, 160 (2016)). Here, testimony that Thomas was actively looking for 493 members each day provides a "logical connection" to the motive for the May 1, 2021, shooting, and is therefore relevant to that material issue.

Although the second Cofield factor is not required in every case, it is applicable here because Thomas looking for 493 members to kill each day or telling other 5-Deuce members to do so is "similar in kind" to the offense with which Thomas was charged, the murder of a 493 member. 127 N.J. at 338. Regarding the third factor, whether the evidence of the other crime is "clear and convincing," ibid., Morales corroborated M.J.'s testimony that Thomas wanted revenge against 493 for shooting at Carswell and wanted 5-Deuce "to get 493." Peselli also confirmed that 5-Deuce members, including Thomas, "felt like there needed to be retaliation for what had happened to . . . Carswell." Thus, the evidence satisfied the "clear and convincing" standard that Thomas and other 5-Deuce members were looking to seek revenge on 493 members ever since Carswell's shooting. Ibid.; see In re Samay, 166 N.J. 25, 30 (2001) ("The clear and convincing standard may be satisfied by uncorroborated testimonial evidence.").

A-2098-23

Additionally, the probative value of the evidence outweighs its prejudicial effect, Cofield, 127 N.J. at 338, because testimony that 5-Deuce was actively seeking to retaliate against 493 speaks to why the May 1, 2021 shooting occurred and why the plan to shoot at members of 493 began to unfold as soon as 5-Deuce members discovered that 493 members were in the neighborhood. Goodman, 415 N.J. Super. at 230 (noting the fourth Cofield factor was satisfied when gang-related evidence "explain[ed]" the defendant's killing of the victim and "why the events unfolded as they did"); Garrison, 228 N.J. at 197-98 (noting that other-bad-act evidence of motive or intent requires a "very strong showing of prejudice to justify exclusion"). Thus, we discern no abuse of discretion in the judge admitting the testimony.

Thomas also argues the judge failed to give the jury any instruction on how to use the other-bad-act evidence admitted at trial. Because defendant failed to object during trial and raises this issue for the first time on appeal, we again review for plain error. See R. 2:10-2; State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if [the defendant] does not object to the instructions as required by Rule 1:7-2."). Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently

grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting Adams, 194 N.J. at 207).

"[B]ecause clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Still, if a defendant does not object when a charge is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)); see State v. Walker, 203 N.J. 73, 90 (2010) ("The error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" (quoting State v. Chapland, 187 N.J. 275, 289 (2006))).

Where evidence of other bad acts is admitted, trial courts should "take pains to instruct juries carefully and comprehensively, with ample reference to the specific evidence and issues in a case, on the limited relevance of other[ bad-act] evidence." State v. Stevens, 115 N.J. 289, 309 (1989). The instruction should "'narrowly focus the jury's attention on the specific use of other-crime

evidence' rather than merely make 'reference only to the generalities of the Rule," State v. Oliver, 133 N.J. 141, 157 (1993) (quoting Cofield, 127 N.J. at 341), and should "inform the jury of the purposes for which it may, and for which it may not, consider the evidence of defendant's uncharged misconduct," State v. Rose, 206 N.J. 141, 161 (2011).

Ordinarily, the trial court must provide a limiting instruction to the jury "both when the evidence is first presented and again as part of the final jury charge." Garrison, 228 N.J. at 200 (quoting Rose, 206 N.J. at 161). Although "a prompt delivery of limiting instructions, either before, simultaneously with, or immediately after[] the admission of other[-]crimes evidence is preferable," "[n]either the Rules of Evidence nor case law in this State dictates that a limiting instruction respecting N.J.R.E. 404(b) must be delivered at the time the evidence is received rather than as part of the court's final charge to the jury." State v. Angoy, 329 N.J. Super. 79, 89-90 (App. Div. 2000).

Here, in the final charge, the judge instructed the jury on other-crimes evidence as follows:

> The State has introduced evidence that, allegedly, the defendant is a member of a street gang. It is not a crime to be a member of a street gang. The State is offering this evidence only to show an alleged motive for the charges. You may not use this alleged evidence to show defendant has a disposition or a tendency to do

> wrong, and therefore must be guilty of the charged offenses.
>
> Normally such evidence is not permitted under our Rules of Evidence. However, our rules do permit this type of evidence when evidence is used for a specific, narrow purpose. You should consider this evidence, along with all other evidence in the case, in determining whether or not the State has proven beyond a reasonable doubt.

This instruction generally tracks the model jury charge. See Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016). Thomas did not object to the timing of the charge and did not request any additional jury charge in relation to the other-bad-act evidence. Thus, there is a presumption the charge was not error and did not prejudice Thomas's case. See Singleton, 211 N.J. at 182 ("If the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case."). The judge delivered a limiting instruction that properly outlined the purpose for which the other-crime evidence had been admitted and told the jury it could not consider the evidence for any broader purpose. Although the judge did not give the limiting instruction when the evidence was received, he was not required to do so under our jurisprudence.

Thomas also argues for the first time on appeal the judge should have given the jury a N.J.R.E. 404(b) instruction regarding the jail call. Because Thomas did not request such an instruction at trial or during the charge conference, we again "review[] under a plain error standard." State v. Cole, 229 N.J. 430, 455 (2017).

After conducting a N.J.R.E. 104 hearing, the judge admitted the jail call pursuant to N.J.R.E. 803(b)(1), as a statement of a party opponent. The judge also considered N.J.R.E. 403 and concluded the prejudice was outweighed by the probative value of the call. At trial, the parties stipulated that there was "a recording of a phone call made by Jaquan Thomas on Saturday, September 30[], 2023 at approximately 7:36 p.m.," and then played the call for the jury.

Thomas argues the jail call "was clearly other-crime evidence offered to prove consciousness of guilt" and therefore the jury should have been instructed as such. However, the jail call did not constitute "other-crime evidence" because Thomas's statements in the call directly related to the crimes for which he was being prosecuted. Our Supreme Court has stated "[t]he threshold determination under Rule 404(b) is whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules

relating to relevancy, most importantly Rule 403." Rose, 206 N.J. at 179. Evidence is intrinsic "if it directly proves the charged offense" because "[i]f uncharged misconduct directly proves the charged offense, it is not evidence of some other crime." Id. at 180 (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)) (internal quotation marks omitted).

Thomas's jail call statements related to the crimes for which Thomas was on trial and were thus "intrinsic to the charged crime[s]." Id. at 179. In the call, Thomas stated Morales was to testify that Thomas was not on Garrison Street the day of the shootings, that Thomas did not give Morales the guns used in the shootings, and that the plan for the shootings came from M.J. Because those statements did not pertain to crimes other than the charged crimes, N.J.R.E. 404(b) was not implicated, Rose, 206 N.J. at 179, and the judge was not required to give the jury a N.J.R.E. 404(b) limiting instruction.[9]

---

[9] Additionally, consciousness of guilt is not one of the enumerated purposes cognizable under N.J.R.E. 404(b). See Biunno, Weissbard & Zegas, cmt. 15 on N.J.R.E. 404 ("When a criminal defendant makes threats against a prosecution witness with the intent to induce him [or her] not to testify[,] he [or she] cannot rely on N.J.R.E. 404(b) to bar testimony relating to those threats [because s]uch testimony is admissible as illuminating the 'defendant's consciousness of his [or her] own guilt.'"); see also State v. Buhl, 269 N.J. Super. 344, 364 (App. Div. 1994) ("Our courts have long held that evidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt.").

IV.

Thomas argues in Point II the prosecutor engaged in misconduct during summation in referring to the jail call.

"'[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' . . . ." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Frost, 158 N.J. 76, 82 (1999)).  To that end, prosecutors are "'afforded considerable leeway in closing arguments' as long as their comments . . . 'stay[] within the evidence and the legitimate inferences [drawn] therefrom.'"  Ibid. (first quoting Frost, 158 N.J. at 82; and then quoting State v. R.B., 183 N.J. 308, 330 (2005)).

Thus, "if a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation[,] or appeal, will afford no ground for reversal.'"  State v. Smith, 167 N.J. 158, 178 (2001) (quoting State v. Johnson, 31 N.J. 489, 510 (1960)).  On the other hand, "making inaccurate factual assertions to the jury," State v. Garcia, 245 N.J. 412, 435 (2021) (citing Smith, 167 N.J. at 178), or "advanc[ing] improper arguments" is inappropriate, State v. Lazo, 209 N.J. 9, 29 (2012).

Nonetheless,

A-2098-23

even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end. Rather, we weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," and we reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive [the] defendant of a fair trial."

[McNeil-Thomas, 238 N.J. at 275 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).]

Stated differently, we will not reverse a conviction based on prosecutorial misconduct during the State's summation unless it "substantially prejudice[d] the defendant's fundamental right to have the jury fairly evaluate the merits of his[ or her] defense." Garcia, 245 N.J. at 436 (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

In reviewing a claim of prosecutorial misconduct, "an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." State v. Williams, 244 N.J. 592, 608 (2021) (quoting Frost, 158 N.J. at 83). "Factors to be considered in making that decision include, '(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Ibid. (quoting Frost, 158 N.J. at 83). Additionally, "[i]n reviewing closing arguments,

54

we look, not to isolated remarks, but to the summation as a whole," State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008), mindful that "[a] prosecutor may respond to an issue or argument raised by defense counsel," and such a response "cannot be considered a foray beyond the evidence adduced at trial." State v. Johnson, 287 N.J. Super. 247, 266 (App. Div. 1996).

Here, because the prosecutor's alleged improprieties were in response to defense counsel's comments about the jail call, we first set forth those comments in some detail. At the beginning of her summation, Thomas's counsel told the jury "if the State spends a lot of time talking about that telephone call, it's because . . . they want you to be so offended—and that phone call is beyond offensive—that you lose focus on what happened in this courtroom." Counsel further stated Thomas "didn't do anything" and "the State's corroborating witnesses who came in here and said that he did are all lying. Just because they say it doesn't make it true. And just because he made a stupid and idiotic telephone call doesn't make it true either."

Defense counsel later elaborated:

> [W]hat you heard on that tape was a scared person who was trying to convince somebody to say something else, trying to convince Mr. Morales to tell the jury about his innocence, when, really, his innocence was part of the case the whole time. That phone call was a stupid move by a scared and desperate person, but it didn't change

the burden of proof. The burden of proof is on the [S]tate.

In the prosecutor's summation, after playing portions of the jail call, referring to Thomas's instruction to Morales about the source of the gun, the prosecutor stated:

> Now, if that fact didn't happen, why is he so concerned about it, that he got the guns out of his room, right? Use your common sense. Why is that fact something that he needs to make sure Joseph Morales doesn't say happened? Because it's true. Because he knows it is, and he needs to [e]nsure that during his testimony, Joseph Morales doesn't say that. He needs to say that, oh, [M.J.] . . . told me to do this. He told me to lie to you. He told me to say what I'm saying on the stand. That's what Jaquan Thomas is telling him.

The prosecutor also said Thomas used the jail call "to dismantle" Peselli's testimony "[b]ecause now, as was testified, he's scared, because he knows what's coming out is true." The prosecutor further stated, "And what did Joseph Morales tell us? That he got the guns from Jaquan Thomas. Why would [Thomas] say, make sure he doesn't say he got it from me, unless he knew it was true."

At that point, outside the presence of the jury, the judge stopped the prosecutor's summation and the following exchange ensued:

> [COURT]: Normally, I don't stop people in opening or closing, but I think you're going to stop telling the

> jurors what was on . . . defendant's mind, that he's doing this because. It's for them to decide, not for the State, because that's not part of the evidence, okay?
>
> [PROSECUTOR]: I respectfully disagree. These are all inferences that can be drawn from the evidence.

During the lengthy colloquy that followed, the judge acknowledged defense counsel's comment that defendant had made the call because he was scared. However, the judge pointed out defendant "ha[d] not testified," so "no[]one has said why this defendant did what he [did]." The judge cautioned the prosecutor he was allowed to tell the jurors they could "draw an inference from th[e] testimony," but he could not "say this is why [defendant] did it." The prosecutor asked if he could continue his commentary so long as he premised it by "say[ing], this is the State's position." The judge agreed and the prosecutor's summation resumed.

The judge did not give the jury any type of instruction before allowing the prosecutor to finish his summation. In the final charge, however, the judge instructed the jury, "summations, closings of counsel, are not evidence, and must not be treated as evidence" and "[a]lthough the attorneys may point out what they think is important in th[e] case, you must solely rely upon your understanding and recollection of the evidence that was admitted during th[e] trial."

We are satisfied the prosecutor's summation was proper and did not stray beyond the lines of permissible commentary.  The prosecutor asked the jurors to draw "reasonable inferences" from the call, which was entered into evidence and played for the jury.  Frost, 158 N.J. at 85.  While Thomas argues the prosecutor improperly commented on Thomas's rationale for making the call, his own counsel first introduced the notion when she indicated in her summation that Thomas made the call because he was scared and that Morales, M.J., and Peselli were lying about Thomas's involvement.  See State v. Vasquez, 374 N.J. Super. 252, 260-62 (App. Div. 2005) (explaining the prosecutor's remarks did not constitute reversible error where they were in response to defense counsel's argument that State's witnesses deliberately lied or stretched the truth to obtain a conviction).

V.

Thomas argues in Point III that Turner improperly narrated the surveillance videos and offered lay opinion testimony about factual matters in dispute in violation of N.J.R.E. 701 and Watson, 254 N.J. 558, decided shortly before the trial.

"We defer to a trial court's evidentiary ruling absent an abuse of discretion."  Garcia, 245 N.J. at 430.  "Under that deferential standard, we

review a trial court's evidentiary ruling only for a 'clear error in judgment,'" and "do not substitute our own judgment for the trial court's unless its 'ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Medina, 242 N.J. 397, 412 (2020) (first quoting State v. Scott, 229 N.J. 469, 479 (2017); then quoting State v. Brown, 170 N.J. 138, 147 (2001)) (internal quotation marks omitted). Because Thomas did not object to Turner's narration testimony, we again review for plain error and will only reverse if any error was "clearly capable of producing an unjust result." Clark, 251 N.J. at 287 (quoting R. 2:10-2).

Lay opinion testimony is admissible subject to two conditions set forth in N.J.R.E 701. First, the lay witness's opinion must be "rationally based on the witness'[s] perception"; second, the opinion must "assist in understanding the witness'[s] testimony or determining a fact in issue." N.J.R.E. 701. To satisfy the first condition, the "witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. Sanchez, 247 N.J. 450, 466-67 (2021) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)). In Watson, our Supreme Court stated "[a]n investigator who has carefully reviewed a video a sufficient number of times prior to trial can . . .

satisfy [N.J.R.E. 701's] 'perception' and 'personal knowledge' requirements as to what the video depicts."  254 N.J. at 601.

The second N.J.R.E. 701 condition limits lay testimony only to that which will "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue."  Sanchez, 247 N.J. at 469 (quoting State v. Singh, 245 N.J. 1, 15 (2021)); see also State v. Higgs, 253 N.J. 333, 363 (2023) (same).  The second condition therefore precludes "lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'"  Sanchez, 247 N.J. at 469-70 (alteration in original) (quoting State v. McLean, 205 N.J. 438, 459 (2011)).

In considering how our case law has applied N.J.R.E. 701 to law enforcement officers narrating video recordings relating to the offense charged, our Supreme Court stated:

> In Higgs, we barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a surveillance video appeared to be a firearm.  253 N.J. at 365-67. Applying N.J.R.E. 701's "perception" prong, we noted that the detective "had no prior interaction or familiarity with either defendant or the firearm in question" and that "[h]is testimony was based entirely on his lay opinion from watching the video."  Id. at 365. We reasoned that "[t]he video was in evidence and the jury should have been permitted to view it slowly, frame by frame, to determine for themselves what they

saw on screen, without the influence of opinion testimony by an officer who was not there at the time." Id. at 367. We held that the officer's testimony had invaded the jury's province. Id. at 366-67. We did not, however, "rule out the possibility of allowing a law enforcement officer to testify about a sequence in a video that is complex or particularly difficult to perceive." Id. at 367.

In State v. Watson, . . . we addressed the admissibility of a police officer's narration of a video of a bank robbery at which the officer was not present, and held that the narration exceeded the bounds of proper lay opinion testimony under N.J.R.E. 701 and N.J.R.E. 602[10] when the officer provided commentary about the suspect's actions during the robbery. Watson, 254 N.J. at 606-08. We disapproved of portions of the officer's narration testimony that reflected his subjective belief of what occurred in the surveillance video, including observations about alleged efforts by the suspect not to touch surfaces during the robbery and a comment that "the suspect was very careful in . . . not attempting to leave any type of evidence behind." Id. at 608.

[State v. Allen, 254 N.J. 530, 545-46 (2023) (alterations and last omission in original) (citations reformatted).]

In Allen, decided the same day as Watson, a central question was whether the defendant accidentally or intentionally fired a handgun at a police officer who was chasing him. Allen, 254 N.J. at 537-38. The officer gave a firsthand

---

[10]  N.J.R.E. 602 provides that, other than expert witnesses, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

account that "as [the] defendant ran into a vacant lot, he 'turned 180 degrees, that would be counterclockwise, raised the handgun and fired at me' from a distance of eighteen to twenty-four feet." Id. at 537. In contrast, the defendant acknowledged that he ran from the officer but testified the gun discharged accidentally when he was trying to throw it away. Id. at 538.

Much of the incident was captured on two surveillance videos from a nearby building, which were shown to the jury at trial. Id. at 539. As part of his investigation, the lead detective "used the videos to locate areas of interest for his processing of the crime scene." Ibid. At trial, over defense counsel's objection, the trial court allowed the lead detective to testify about the videos because they informed his investigative strategy. Id. at 539-40.

After reviewing the details of the lead detective's testimony, the Allen Court concluded the trial court had "properly permitted the detective to testify about the manner in which he used the surveillance video to guide his investigation." Id. at 535. According to the Court, "[t]hat testimony included two categories of admissible evidence: fact testimony from a forensic investigator about the steps he took at the crime scene, and testimony rationally based on the witness's perception and helpful to the trier of fact." Id. at 548.

However, relying on the principles enunciated in <u>Watson</u>, the Court held "the detective's testimony opining that the video showed defendant turning and firing his weapon should have been excluded from evidence." <u>Id.</u> at 535. The Court stated the detective's "comments about defendant's actions were improper" because he "was not present on the scene and had no personal knowledge of the incident" but "testified in support of the State's position as to sharply disputed facts." <u>Id.</u> at 549.

After reviewing other jurisdictions' handling of the subject, the <u>Watson</u> Court held that "Rules 701, 602, and 403 provide a framework for the admission of narration evidence" by "a witness who did not observe events in real time." <u>Watson</u>, 254 N.J. at 600, 602. The Court instructed:

> [W]hether narration evidence is helpful turns on the facts of each case. Rule 701's helpfulness prong can be satisfied when an investigator draws attention to key details that might be missed, or helps jurors follow potentially confusing, complex, or unclear videos that may otherwise be difficult to grasp.[11] Counsel may offer other reasons to allow limited narration testimony, which courts should evaluate with care.
>
> Narration testimony must also comply with N.J.R.E. 403. The rule guards against the risk of "[u]ndue prejudice, confusion of issues, . . . misleading

---

[11] The Court noted "[s]creenshots, stills, composite videos, and other demonstrative aids can help focus on details that casual observers might miss." <u>Watson</u>, 254 N.J. at 602.

the jury, . . . [and] needless presentation of cumulative evidence." Placing appropriate limits on narration testimony can help avoid those problems.

[Watson, 254 N.J. at 602 (omissions and last two alterations in original).]

To that end, the Court cautioned that such testimony "must accord with specific limits." Ibid. First, "continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording" must be avoided. Id. at 603. Instead, "counsel must ask focused questions designed to elicit specific, helpful responses." Ibid. Second, investigators may "describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations." Ibid. For example, if "[t]he 'individual opened the door with his elbow,'" the investigator may present those objective facts if not reasonably in dispute but not "subjective interpretations" such as that he did so to avoid leaving fingerprints. Ibid.

"Third, investigators may not offer their views on factual issues that are reasonably disputed," as "[t]hose issues are for the jury to decide." Ibid. Thus, "a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not." Ibid. Finally, while "lay witnesses generally may offer opinion testimony under Rule 701 based on inferences,

investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence. That type of comment is appropriate only for closing argument." Id. at 604. The Court explained that "[c]onsistent with those principles, an investigator who carefully reviewed a video in advance could draw attention to a distinctive shirt or a particular style of car that appear[s] in different frames, which a jury might otherwise overlook" if those issues are not in dispute. Ibid.

Guided by these principles, we discern no error in Turner's narration testimony. Turner testified about the surveillance videos taken from several different streets and angles within the Garrison Street neighborhood in Paterson as well as two compilation videos, one depicting the three suspected shooters from Redwood Avenue and the other depicting the two suspected shooters from Albion Avenue. Turner's testimony satisfied N.J.R.E. 701's perception requirement because he had "carefully reviewed" the surveillance footage he testified about "a sufficient number of times prior to trial." Watson, 254 N.J. at 601. Turner's testimony also satisfied N.J.R.E. 701's helpfulness requirement pursuant to the factors laid out in Watson.

The video surveillance footage would have been "confusing" and "chaotic" for the jury without Turner's narration. Id. at 601. Turner's testimony

65

helped the jury "follow potentially confusing, complex, or unclear videos" that would have otherwise been "difficult to grasp." Id. at 602. Indeed, given the sheer volume of surveillance footage, it would have been "unrealistic" for the jury to "trace individual movements from frame to frame" and understand the evidence. Id. at 601. Further, Turner's testimony comported with the safeguards surrounding narration testimony set out in Watson. His testimony was not a "continuous commentary," but was instead responsive to "focused questions" about each individual video. Id. at 603.

Thomas argues it was improper for Turner to testify as follows: (1) that police "believed there were five shooters" between the two scenes, three on Redwood Avenue and two on Albion Avenue; (2) that one of the three suspects from the Redwood Avenue shooting could be seen "with a silver object in his hand that he puts in his waistband" in the backyard of a house on Jasper Street; (3) that the three suspects from Redwood Avenue were seen "wearing different colored clothing" after the shooting compared to what they had on before; (4) that he "heard two shootings occur" on the surveillance videos; (5) that the white Kia dropped off "two individuals" "matching the description of the two individuals later seen on Albion Ave"; and (6) that the individuals in the various surveillance videos were suspects or shooters.

On the contrary, Turner made "objective, factual comments" on what he observed on the videos, rather than providing "subjective interpretations." Ibid. Turner testified he saw one of the individuals suspected to be involved in the Redwood Avenue shooting "with a silver object in his hand that he put[] in his waistband." Turner did not testify that the "silver object" was a gun or opine that the object was a gun. Contra Allen, 254 N.J. at 548-49 (finding improper narration amounting to inadmissible lay opinion when officer testified the "white blip" on a surveillance video was "the defendant firing the handgun" and noting that had the officer "comment[e]d on the fact that the surveillance video showed the discharge of a weapon at a particular location," that would have "constituted proper narration"); Higgs, 253 N.J. at 365-67 (barring lay opinion testimony of a law enforcement officer that an object depicted in the surveillance video appeared to be a firearm).

Similarly, Turner testified three suspects from Redwood Avenue were seen "wearing different colored clothing" after the shooting compared to what they had on before, but did not testify it meant that these individuals had changed their clothing to avoid apprehension or suspicion following the shooting. Contra Watson, 254 N.J. at 608 (finding improper narration amounting to inadmissible lay opinion when an officer reflected his subjective belief that the suspect tried

to not touch any surfaces during surveillance video of a robbery so as "not . . . to leave any type of evidence behind" (omission in original)).

Moreover, although Turner used the term suspects or shooters to refer to individuals in the videos, he did not identify either defendant on any video and admitted he did not know at the time he obtained and reviewed the videos the identities of any of the individuals. Additionally, Turner's testimony indicating that one video showed the white Kia dropping off two individuals who matched the description of those seen on Albion Avenue speaks to Turner's perception and "dr[e]w attention" to distinctions in the videos "that appear in different frames, which a jury might otherwise overlook." Id. at 604.

Further, Thomas never disputed any of the testimony he complains about on appeal. Thomas never disputed there were five shooters in total and two different shootings. Thomas disputed his involvement and planning of the shootings. However, neither contention was encompassed in Turner's narration testimony. Thomas was never accused of being present at either shooting or on any surveillance video, and was never identified as one of the individuals, suspects, or shooters on the videos.

To the extent Thomas argues Turner's testimony served to improperly bolster the credibility of the three 5-Deuce cooperators, nowhere in Turner's

A-2098-23

testimony did he indicate that what was depicted in the videos was supported by M.J.'s, Morales's, or Peselli's testimony, or that the contents of the videos showed these witnesses were credible. Contra State v. Frisby, 174 N.J. 583, 595 (2002) (finding a detective's lay opinion testimony that one witness was "more credible" than the defendant, thereby "essentially vouch[ing]" for the witness over the defendant, was inadmissible lay opinion because "that was the ultimate question for the jury" and "could have tipped the credibility scale," warranting reversal).

Although Thomas argues the strongest evidence of his guilt was the cooperating co-defendants' testimony, who all had a motive to lie, the jury heard the plea bargains each witness made and heard the cross-examination where their respective motives to enter into the plea agreements with the State were assiduously challenged. The jury drew its own conclusions about the witnesses' credibility.

## VI.

Thomas argues in Point I of his supplemental brief that the conspiracy to commit murder jury instruction was erroneous because the judge did not instruct the jury on conspiracy to commit the lesser-included offenses to murder. Because Thomas did not object to the charge at trial, we again review for plain

error, "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Camacho, 218 N.J. at 554 (alteration in original) (quoting Adams, 194 N.J. at 207).

It is well settled that

> "'[a]ppropriate and proper charges are essential for a fair trial.'" State v. Reddish, 181 N.J. 553, 613 (2004) (quoting State v. Green, 86 N.J. 281, 287 (1981)). The trial court must give "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Green, 86 N.J. at 287-88. Thus, the court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." Reddish, 181 N.J. at 613. "Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. Bunch, 180 N.J. 534, 541-42 (2004) (quoting State v. Nelson, 173 N.J. 417, 446 (2002)); see also State v. Jordan, 147 N.J. 409, 422 (1997) (finding "[e]rroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions").
>
> [State v. Baum, 224 N.J. 147, 158-59 (2016) (alterations and omission in original) (citations reformatted).]

70

When reviewing claims of erroneous jury instructions, the charge must be reviewed as a whole. State v. Loftin, 146 N.J. 295, 379 (1996). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Baum, 224 N.J. at 159 (alteration in original) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). "[W]hen a defendant does not object to the charge, 'there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case,'" State v. Cotto, 471 N.J. Super. 489, 544 (App. Div. 2022) (omission in original) (quoting Montalvo, 229 N.J. at 320), and "any finding of plain error depends on an evaluation of the overall strength of the State's case." Id. at 545 (quoting State v. Nero, 195 N.J. 397, 407 (2008)).

Pursuant to N.J.S.A. 2C:5-2(a):

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he [or she]:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

A-2098-23

The "'major basis of conspiratorial liability [is] the unequivocal evidence of a firm purpose to commit a crime' that is provided by the agreement." State v. Samuels, 189 N.J. 236, 245 (2007) (alteration in original) (quoting State v. Roldan, 314 N.J. Super. 173, 181 (App. Div. 1998)). "Actual commission of the crime is not a prerequisite to conspirator liability" since "[i]t is the agreement that is pivotal." Id. at 245-46; see also State v. Ball, 141 N.J. 142, 178 (1995) ("A conspiracy conviction does not turn on 'doing the act, nor effecting the purpose for which the conspiracy is formed, nor in attempting to do them, nor in inciting others to do them, but in the forming of the scheme or agreement . . . .'" (quoting State v. Carbone, 10 N.J. 329, 337 (1952))).

Here, the judge gave a conspiracy jury instruction that mirrored the model jury charge. See Model Jury Charges (Criminal), "Conspiracy (N.J.S.A. 2C:5-2)" (rev. Apr. 12, 2010). Instructions that are given in accordance with the model jury charge, or which closely track the model jury charge, are generally not considered erroneous. State v. Ramirez, 246 N.J. 61, 70 (2021). "Indeed, a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" Cotto, 471 N.J. Super. at 543 (quoting R.B., 183 N.J. at 325); see also Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000) ("It is

A-2098-23

difficult to find that a charge that follows the Model Charge so closely constitutes plain error.").

We reject Thomas's contention the conspiracy to commit murder jury instruction was erroneous because the judge did not instruct the jury on conspiracy to commit the lesser-included offenses to murder. Conspiracy is in itself a lesser-included offense. State v. Soltys, 270 N.J. Super. 182, 189 (App. Div. 1994). "By definition, conspiracy is a lesser included offense of the crime which constitutes the object of the conspiracy, and the conspiracy merges into the completed act." Ibid. Because the conspiracy to commit murder was already a lesser-included offense to murder, there were no other lesser-included offenses to conspiracy instruction for the judge to give. See State v. Ingram, 196 N.J. 23, 39 (2008) (finding that conspiracy to commit robbery "would not have been susceptible to a lesser-included offense instruction" because that crime "required either direct or indirect liability for robbery as a condition precedent for culpability").

## VII.

Thomas argues in Points II and III of his supplemental brief that the accomplice liability instruction was inadequate because the judge failed to tailor

the charge to the facts of the case.[12]   Because Thomas did not object to the accomplice liability charge at trial, we again review for plain error.  Camacho, 218 N.J. at 554.

Although "[m]odel jury charges are often helpful to trial judges in performing th[e] important function [of charging a jury]," State v. Concepcion, 111 N.J. 373, 379 (1988), our courts have recognized that some circumstances require a judge to "mold" the model jury charge "in a manner that explains the law to the jury in the context of the material facts of the case." Cotto, 471 N.J. Super. at 543 (quoting Concepcion, 111 N.J. at 379).  The requirement to mold the instruction has been imposed in various contexts such as when the charge includes a "statement of relevant law" that "when divorced from the facts, was potentially confusing or misleading to the jury."  Ibid. (quoting State v. Robinson, 165 N.J. 32, 42 (2000)).  Tailored instructions may also be useful "in a protracted trial with conflicting testimony." Concepcion, 111 N.J. at 380.

Regarding accomplice liability jury instructions in particular, our Supreme Court has acknowledged "the importance of tailoring the jury charge to the facts of the case."  State v. Savage, 172 N.J. 374, 389 (2002); see also State v. Cook, 300 N.J. Super. 476, 487 (App. Div. 1996) (noting that at a trial

---

[12]  The points present virtually identical arguments.

involving multiple defendants, "the jury needed a detailed explanation of accomplice liability theory tied into the facts" (emphasis added)). Nonetheless, we have "emphasize[d]" that "there is no principle requiring that in every case[,] a court must deliver a specifically tailored instruction relating . . . the facts of the case to the applicable law," Cotto, 471 N.J. Super. at 544 (quoting State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002)), and "not every failure [to tailor jury instructions] is fatal." Ibid. (alteration in original) (quoting State v. Tierney, 356 N.J. Super. 468, 482 (App. Div. 2003)). "When the facts are neither complex nor confusing, a court does not have to provide an intricate discussion of the facts in the jury charge." Ibid.

"By definition[,] an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he [or she] is charged as an accomplice." State v. Bielkiewicz, 267 N.J. Super. 520, 527-28 (App. Div. 1993) (quoting State v. White, 98 N.J. 122, 129 (1984)). "Therefore, a jury must be instructed that to find a defendant guilty of a crime under a theory of accomplice liability, it must find that he [or she] 'shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'" Id. at 528 (quoting State v. Fair, 45 N.J. 77, 95 (1965)). "In addition, when an alleged accomplice is charged

75

with a different degree offense than the principal or lesser included offenses are submitted to the jury, the court has the obligation to 'carefully impart[] to the jury the distinctions between the specific intent required for the grades of the offense.'" Ibid. (alteration in original) (quoting State v. Weeks, 107 N.J. 396, 410 (1987)).

"[I]mposition of vicarious liability for a crime whose culpability requirement is recklessness requires an initial focus on the actor's conduct rather than on the crime itself." Bridges, 254 N.J. Super. at 565; see also Bielkiewicz, 267 N.J. Super. at 529-30 (noting that the Supreme Court in Bridges "did not disagree with [the Appellate Division's] discussion of accomplice liability as applied to murder and the lesser included offenses of aggravated manslaughter and manslaughter"). "As a first condition, the accomplice . . . must have intended that the actor's conduct take place, i.e., that the accomplice . . . had the purpose of promoting or facilitating the commission of that conduct by the actor and took some step or steps . . . to promote or facilitate that conduct . . . ." Bridges, 254 N.J. Super. at 565. "If the actor is liable for an 'intent' crime, vicarious liability for that crime may only attach to an accomplice . . . who shared the intent that that crime be committed." Id. at 566.

"Vicarious liability for a 'reckless' crime may also . . . attach when the actor commits an 'intent' crime and the accomplice . . . did not intend that that crime be committed but nevertheless intended that the actor take a specific action or actions which resulted in the crime." Ibid. "The point . . . is that each participant in a common plan may participate therein with a different state of mind" and "[t]he liability of each participant for any ensuing crime is dependent on his own state of mind, not on anyone else's." Ibid.

Here, the instructions "set[] forth accurately and fairly the controlling principles of law" regarding accomplice liability. Baum, 224 N.J. at 159 (quoting Jackmon, 305 N.J. Super. at 299). The judge's accomplice liability charge specifically instructed the jurors that if they found any defendant not guilty "of acting as an accomplice on the specific crime charged," which was murder, "then [they] should consider whether a defendant did act as an accomplice, but with the purpose of promoting or facilitating the commission of some lesser other offense than the actual crimes charged in the indictment." The judge also told the jury "each person who participates in the commission of an offense may do so with a different state of mind, and the liability or responsibility of each person is dependent on his own state of mind, and no one else's."

The judge's accomplice liability instruction was a near verbatim reading of the model jury charge, which was specifically revised to address Bielkiewicz. See Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6) Accomplice Charge # Two" (rev. June 11, 2018). In Savage, although the trial court gave an accomplice liability instruction that tracked the model jury charge, the instruction "failed to articulate factually how" one defendant "could have been guilty of purposeful or knowing murder" while the other could have been "guilty of one of the lesser offenses . . . if he possessed a different state of mind." 172 N.J. at 393.

The Savage Court pointed out that the "accomplice liability instruction was not tied to the facts at all and, in that respect, violated our often-expressed exhortation that, to serve its purpose, a charge, especially a complex one, should be tethered to the facts that the jury has heard." Id. at 393-94. The Court noted "under ordinary circumstances, [it] would presume that the jury understood and followed th[e] instructions" because "the trial court instructed the jury in accordance with relevant legal principles." Id. at 394.

However,

> [The Court could] not indulge that presumption here because . . . the jury asked the following question:

> Because of the wording on the counts[,] it seems we have to vote guilty because of the "law." Some of us don't believe the defendant was the instigator or planned the murder[] but because of the wording[,] we cannot express these feelings.
>
> In response, the trial court answered essentially that it was the judge of the law, not the jury; that the jury was required to follow the law; and if it needed further instructions, they would be given.
>
> [Ibid.]

In reversing the murder conviction, the Savage Court determined "[t]he trial court's failure to inquire further into the jury's note and to re-explain the accomplice charge in the context of the facts was plain error." Id. at 395.

Although a tailoring of the accomplice liability instruction to the facts would have been preferable here, we presume the jury understood the instruction without such tailoring. See, e.g., State v. Burris, 145 N.J. 509, 531 (1996) (citing State v. Manley, 54 N.J. 259, 270 (1969)) (stating that with regard to proper use of evidence, "the Court presumes that juries will understand and abide by the court's instruction"). Critically, unlike Savage, there was no note from the jury indicating any confusion regarding the accomplice liability charge. Moreover, the jury found Thomas guilty of murder and Leon guilty of aggravated

manslaughter, demonstrating its clear understanding of the legal principles encompassing accomplice liability. Accordingly, we discern no plain error.

VIII.

Thomas argues in Point IV of his supplemental brief that the cumulative effect of the trial errors warrants a new trial.

"An appellate court may reverse a trial court's judgment if the cumulative effect of a series of errors is so great as to deprive a defendant of a fair trial." State v. Burney, 255 N.J. 1, 29 (2023). "Cumulative error analysis does not 'simply entail[] counting mistakes, because even a large number of errors, if inconsequential, may not operate to create an injustice.'" Ibid. (alteration in original) (quoting Pellicer v. Saint Barnabas Hosp., 200 N.J. 22, 55 (2009)). "Rather, 'the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair.'" Ibid. (quoting State v. Wakefield, 190 N.J. 397, 538 (2007)).

Here, although Thomas's trial was not perfect, we are satisfied he received a fair trial. See State v. Koskovich, 168 N.J. 448, 540 (2001) ("[W]e still adhere to the general principle that '[a] defendant is entitled to a fair trial but not a perfect one.'" (second alteration in original) (quoting State v. Feaster, 156 N.J. 1, 84 (1998))). Thus, Thomas's cumulative error argument fails.

A-2098-23

IX.

Thomas argues in Point IV of his counseled brief that the judge erred in imposing a consecutive sentence for possession of the weapon used to commit the murder.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In State v. Yarbough, 100 N.J. 627, 643-44 (1985), our Supreme Court set forth guidelines for evaluating the threshold question of whether to impose concurrent or consecutive sentences pursuant to N.J.S.A. 2C:44-5(a).  The Yarbough Court enumerated five specific facts sentencing courts should consider, including whether or not:

81

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous.

[Id. at 644.]

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory range," State v. Abdullah, 184 N.J. 497, 514 (2005), and "should be applied qualitatively, not quantitatively." State v. Carey, 168 N.J. 413, 427 (2001); see also State v. Molina, 168 N.J. 436, 442 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims"). Further, our Supreme Court has made clear that an "explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding" is essential to facilitate meaningful appellate review. State v. Torres, 246 N.J. 246, 268 (2021).

Here, in imposing sentence, the judge found aggravating factors one, three, five, six, and nine applied based on "[t]he senseless nature of the shooting" and Thomas's role in orchestrating it, the high risk of re-offense, Thomas's "gang affiliation" and "the retaliatory nature" of the offenses, Thomas's extensive prior criminal history, and the need for general and specific deterrence. See N.J.S.A. 2C:44-1(a)(1), (3), (5), (6), (9). The judge found mitigating factor six applied, based on Thomas's willingness "to compensate the victim['s family] for their loss," see N.J.S.A. 2C:44-1(b)(6), but rejected all the other mitigating factors argued by defense counsel in mitigation of sentence. The judge concluded "the aggravating factors substantially outweigh[ed] the mitigating factors."

In considering the State's request for the imposition of consecutive sentences, applying the Yarbough factors, the judge found "the crimes and their objectives were predominantly independent of each other." The judge found "[t]he crimes involve[d] separate acts of violence," "[o]ne was unlawful possession, the other one was to shoot at others," and "[t]he crimes were committed at different times," because "[defendant] was in possession of these weapons prior to the incident." The judge also noted, "[s]ince the[] weapons were in . . . defendant's possession prior to the shooting itself, . . . [e]ven if nothing had occurred, that would have been a separate crime."

The judge did not consider defendant's conduct to be "a single period of [aberrant] behavior" given the months of planned retaliation.  Further, according to the judge, "the evidence was clear that . . . defendant's objective was not to use these weapons to simply hurt one individual, but to shoot at the crowd."  Because defendant had "the intent to hurt other individuals," the judge believed a concurrent sentence "would simply ignore the enormity of th[e] crime," and concluded the Yarbough factors "tilt[ed]" in favor of a consecutive sentence.

As to the overall fairness of the sentence, the judge stated:

> The fairness of the sentence is [forty] years which is above the minimum.  Although it is not the maximum, even though I have said aggravating factors substantially outweigh, that could have tilted more than [fifty] years or so on [c]ount [one] only.
>
> I deviated because the overall fairness is when I take [forty] years and the consecutive, the real time difference to what an individual who is serving, is there will be a [ten] year that will be tacked on.  The [ten] year has a five[-]year parole ineligibility that is going to be separate and apart.
>
> So[,] if I take five years, the real time, then 85 percent of the [forty] years that I take, that's more than [thirty] years it comes out.  It is, in my view, a fair judgment considering everything that I have considered.  And when I consider this, I can't look at the man with everything that says negative about him. I have to consider the positive things that a human being has, which I have done.

84

. . . .

> And that is the fairness I find that under the circumstances, as the person who stands before me, the complete person not just one incident, not just two years of a person's life that I have to look. Based on all of this, I find this to be fairness. And that is the reason I did not impose the full maximum life and a consecutive.

We discern no abuse of discretion in the judge's sentencing decision. The judge properly applied the Yarbough factors and concluded the factors weighed in favor of a consecutive sentence. See State v. Cassady, 198 N.J. 165, 181-82 (2009) (upholding imposition of consecutive sentences when "the sentencing court faithfully paired the Yarbough factors with the facts as found by the jury"). The judge also gave a statement explaining why Thomas's overall sentence, including the imposition of a consecutive sentence, was fair as required under Torres, 246 N.J. at 268, 272.

To support his argument that the judge erred in imposing a consecutive sentence, Thomas relies on State v. Copling, 326 N.J. Super. 417 (App. Div. 1999). There, the defendant received consecutive sentences for murder and unlawful possession of a handgun. Id. at 422-23. The trial court reasoned that the "objectives and purposes" of the crimes of weapons possession and murder were different and the victims were different. Id. at 441. We disagreed with

that reasoning, finding instead that "the objective of each [statute] is similar" and "the victims sought to be protected by the two statutes are the same." Id. at 441-42. In reversing the trial court's sentencing decision, we explained:

> The judge's rationale for imposing consecutive sentences is unsupported under the Yarbough analysis because only two factors applied, and in view of the life term with thirty years of parole ineligibility, the consecutive sentences must be deemed unreasonable. The conviction for unlawful possession must be served concurrently to the conviction for murder.
>
> [Id. at 442.]

Here, the judge's Yarbough analysis differed from that in Copling. The judge found consecutive sentences were warranted because Thomas had the weapons before the plan for the shootings ever arose, had been planning retaliation since Carswell's shooting, and directed the shootings into a crowd of people. Thus, there were several Yarbough factors weighing in favor of consecutive sentences beyond the independence of the crimes and their objectives. Furthermore, the defendant in Copling received a life sentence for the murder conviction, whereas here, the judge declined to impose the maximum sentence of life imprisonment for the murder conviction despite the State's request for him to do so. Thus, we are satisfied this case is factually distinguishable from Copling and decline to follow its holding.

A-2098-23

In summary, we affirm Thomas's convictions and sentence, vacate Leon's judgment of conviction, and remand for enforcement of the plea agreement and resentencing in accordance with its terms.

Affirmed as to Thomas, reversed and remanded as to Leon consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-2098-23